IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

R. CHARLES PEARSON,                          3:12-CV-00720-BR

       Plaintiff,

                                OPINION AND ORDER

v.                                           (UNDER SEAL)

CLACKAMAS COUNTY, a political
subdivision of the State of
Oregon, and CAMPBELL GILMOUR,
individually and in his
official capacity as Director
of the Department of
Transportation and
Development,

       Defendants.


**RICHARD C. BUSSE**
Busse & Hunt
621 S.W. Morrison Street
Suite 521
Portland, OR 97205
(503) 248-0504

      Attorneys for Plaintiff

**STEPHEN LEWIS MADKOUR**
Clackamas County Counsel
**ALEXANDER GORDON**
Assistant Clackamas County Counsel
2051 Kaen Road
Oregon City, OR 97045
503-655-8362 97204
(503) 499-4573

Attorneys for Defendants


**BROWN, Judge.**

This matter comes before the Court on Defendants' Motion (#44) for Summary Judgment.  For the reasons that follow, the Court **GRANTS** Defendants' Motion and **DISMISSES** this matter **with prejudice.**


## FACTUAL BACKGROUND

Plaintiff R. Charles Pearson served as an independent contractor "on a contractual and elected basis" for Defendant Clackamas County between 1997 and 2002.

On December 24, 2002, Plaintiff signed an employment agreement with Clackamas County and became the Clackamas County Surveyor in January 2003.

Beginning in 2008 or 2009 the amount needed to support staff salaries and services in the Surveyor's Office from the General Fund increased "dramatically."  Decl. of Richard Busse, Ex. 11 at 4.  At the same time the Public Land Corner Fund, which was also used to fund staff salaries and services in the Surveyor's

2 - OPINION AND ORDER

Office, "plummet[ed] quite rapidly from something over a million dollars, probably in 2009, to something under $400,000 several years later." Busse Decl., Ex. 11 at 4.

In 2010 two employees in the Surveyor's Office were transferred to the Clackamas County Engineering Office, which "effected quite a savings to the Public Land Corner Fund" in 2010 because those employees were then paid from a source other than the General Fund or the Public Land Corner Fund. Busse Decl., Ex. 11 at 5.

On December 29, 2010, Plaintiff provided Defendant Campbell Gilmour, Director of Transportation and Development, with a Mid-Year Budget Review in which Plaintiff noted the County Surveyor's Office was "anticipating a revenue shortage of $150-175 thousand." Busse Decl., Ex. 33 at 1. Plaintiff concluded "the Public Land Corner Fund is in serious trouble. Our reserve funds are at drastically low levels and the ability to maintain the existing staff, without a fee increase, will be impossible." *Id.* at 2.

In early 2011 the Clackamas County Administrator Steven Wheeler advised Gilmour that Wheeler could not "put any more General Fund into the [Surveyor's Office]; in fact, [Gilmour had] to keep it at" its current level "or less." Busse Decl., Ex. 11 at 5.

On March 1, 2011, Plaintiff met with Gilmour and Barbara

3 - OPINION AND ORDER

Cartmill, Deputy Director of the Clackamas County Department of Transportation and Development, to discuss the decision to merge the Surveyor's Office with the Clackamas County Engineering Office.  Plaintiff, Gilmour, and Cartmill then discussed the County's budget problems.  Gilmour proposed a plan to lay off an administrative assistant and Geff Adair, a land surveyor. Gilmour further proposed to reduce Plaintiff to .7 time and to demote the Deputy Surveyor, Carl Clinton, to the position of land surveyor, thus eliminating the position of Deputy Surveyor. Plaintiff proposed the County Surveyor's Office should lay off only the administrative assistant and Adair.  Plaintiff also advised Gilmour that he objected to Gilmour's plan to make Plaintiff .7 time and to demote Clinton to land surveyor because

> the duties of the county surveyor's office come
> directly to the county surveyor.  They don't go to
> the commissioners, they don't go to anybody else.
> That's the statute.
>
> [I]f I was not there -- I had a deputy, Carl
> Clinton.  If they wanted to demote him, then I
> wouldn't have a deputy any longer, and if I so
> chose, I could appoint somebody to act in my
> absence, but I was under no legal obligation to do
> so.
>
> And if I wasn't there on a particular day, and
> somebody wanted to have a plat recorded, that it
> wasn't necessarily the - under anybody else's
> ability to sign that plat out of my absence,
> unless I so authorized it.

Busse Decl., Ex. 6 at 20.  Gilmour testified at deposition that Plaintiff "raised a concern over the legality of the part-time

4 - OPINION AND ORDER

employment, and he said something about there would be lawsuits."
*Id*. at 10.  Gilmore testified he was unclear whether Plaintiff
was expressing concern about potential lawsuits that could be
filed against Clackamas County by residents who failed to receive
surveyor services when they required them if Clinton was
terminated and Plaintiff was reduced to .7 time or whether
Plaintiff was suggesting he might file a lawsuit if he was
terminated.  Busse Decl., Ex. 11 at 11.  Gilmour, however,
believed "if there were legal questions about the part-time
surveyor, then that wouldn't have happened, because that would
have been checked out by legal counsel."  Busse Decl., Ex. 11 at
10.

On March 17, 2011, Gilmour advised Plaintiff, Cartmill,
Clinton, and others via email that "[a] decision has been made to
merge the Surveyor's Division with the Engineering Division.
Declining revenue in the Surveyor's Division and the need to
balance workloads and staffing are the primary reason [*sic*] for
this action."  Busse Decl., Ex. 45.  Shortly thereafter Gilmour
began the process of merging the Surveyor's Office with the
Clackamas County Engineering Office.

Throughout April, May, and June 2011 Gilmour and Wheeler
were in a "holding pattern" with respect to funding, but they did
not "see the revenue picture improving."  Busse Decl., Ex. 11 at
6.  Due to the revenue decreases "it appeared [to Gilmour] that

5 - OPINION AND ORDER

layoffs were potentially eminent [*sic*]."  Busse Decl., Ex. 11 at
8.

Gilmour testified at deposition that because Plaintiff had
been "very firm" in the March 1, 2011, meeting that he "wasn't
inclined to" work .7 time, Gilmour began to consider other
options to reduce staffing in late June 2011.  Busse Decl.,
Ex. 11 at 6, 8.  Later in June 2011[1] Gilmour attended a meeting
with Wheeler, Drury, Cartmill, and Assistant County Counsel Dave
Anderson at which Gilmour recommended terminating Plaintiff
because Plaintiff "was the highest paid employee in the
surveyor's operation, and . . . by terminating [him], [they]
could forgo, for the foreseeable future, a few months perhaps,
the need to lay off two or more employees to effect a similar
cost savings."  Busse Decl., Ex. 11 at 6, 7.  Gilmour also
proposed terminating Plaintiff rather than Clinton because the
Surveyor's Office needed to minimize "a layoff situation where an
employee can bump[2] into another position and then into another
position," which would not result in an actual reduction in

_____

[1] Clackamas County's fiscal year runs from July 1 to June
30.

[2] Pursuant to Clackamas County Employment Policy and
Practice #37, when certain "employee[s are] laid off due to a
reduction in the work force, [they] shall be permitted to
exercise bumping rights by displacing [employees] with less
seniority in a different classification with the same salary
grade or lower in the [same] department, provided that the
bumping employee[s are] qualified to do the work."  Busse Decl.,
Ex. 20 at 2.

costs.  Busse Decl., Ex. 11 at 7.  In June 2011 Clinton was in a
position to "bump" another employee if Clinton was laid off, but
Plaintiff was not in a similar position.  Wheeler concurred with
Gilmour's recommendation.

On June 30, 2011, Gilmour telephoned Plaintiff and advised
him that Wheeler wanted to meet with Plaintiff and Gilmour that
day about a "personnel matter."  Busse Decl., Ex. 11 at 12.  That
meeting, however, was postponed and instead Gilmour met with
Plaintiff to present him with a new employment agreement for his
review.  Under the new employment agreement Plaintiff would be
eligible to receive, among other things, up to 180 days of
severance pay on termination as opposed to severance pay for up
to 90 days under his current contract.  Plaintiff asked to review
the new contract with an attorney and advised Gilmour that he
would make a decision as to the new contract within a week.

On July 5, 2011, Gilmour advised Plaintiff that he needed
Plaintiff's decision as to the new employment agreement by noon
on July 6 "to be able to prepare [Plaintiff's] final paycheck."
Busse Decl., Ex. 11 at 13.  Plaintiff responded he was not aware
that he was being immediately terminated.

Plaintiff did not return the employment agreement on July 6,
2011, and was out of the office through July 12, 2011.

On July 13, 2011, Plaintiff met with Gilmour, Wheeler, and
Drury.  Plaintiff and Wheeler signed Plaintiff's new employment

agreement at the meeting.  Wheeler then gave Plaintiff a

termination letter, which provided in pertinent part:

> As has been discussed with you throughout the
> budget processes beginning in budget year 2008/09,
> there is an ongoing burden to the county general
> fund to support the Surveyor's Office.  Plummeting
> development applications have diminished income
> from fees, and reserves are being depleted at an
> accelerated rate.
>
> Staff layoffs and reassignments have managed to
> slow the rate of declining reserves but left an
> irregular ratio of management and support staff to
> front line staff.  For this reason, we are
> terminating your employment with Clackamas County.
> Please consider this letter to be notice of
> termination of your employment contract effective
> July 13, 2011.

Busse Decl., Ex. 53.

Plaintiff was 68 years old at the time of his termination.

In July 2011 Clinton, who was 64 years old, was hired as

County Surveyor and the Deputy Surveyor position was eliminated.

Clinton reports to Mike Bezner, Clackamas County Engineering

Manager, due to the merger of the County Surveyor's Office with

the County Engineering Office in 2011.


**PROCEDURAL BACKGROUND**

On December 6, 2011, Plaintiff filed a complaint[3] in

Clackamas County Circuit Court in which he brought claims based

on his termination.

---

[3] The original complaint is not attached to the Notice of
Removal and is not in the record before this Court.

8 - OPINION AND ORDER

On April 12, 2012, Plaintiff filed an amended complaint in
state court in which Plaintiff brought claims against Clackamas
County and Gilmour for age discrimination in violation of Oregon
Revised Statute § 659A.030, retaliation for Plaintiff's exercise
of his First Amendment right to free speech, and violation of
Plaintiff's right to freedom of speech guaranteed under the
Oregon Constitution.

On April 23, 2012, Defendants removed the matter to this
Court on the basis of federal-question jurisdiction.

On May 11, 2012, Plaintiff filed a Second Amended Complaint
in this Court in which he withdrew his claim against Defendants
for violation of the Oregon Constitution.

On January 28, 2013, Plaintiff filed a Third Amended
Complaint to correct a typographical error.

On April 16, 2013, Defendants filed a Motion for Summary
Judgment.  The Court took Defendants' Motion under advisement on
May 28, 2013.


**STANDARDS**

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." *Washington Mut. Ins. v. United
States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R.
Civ. P. 56(a).  The moving party must show the absence of a

genuine dispute as to a material fact. *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1223 (9th Cir. 2012).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and point to "specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) "This burden is not a light one. . . .  The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *Id.* (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

"A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir.

2009)(citation omitted).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary."  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009) (citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.

## DISCUSSION

Defendants move for summary judgment on all of Plaintiff's remaining claims.

### I.   Plaintiff's claim for age discrimination in violation of Oregon Revised Statute § 659A.030.

Plaintiff alleges his age was a substantial or motivating factor in his termination in violation of Oregon Revised Statute § 659A.030(1)(a), which provides in pertinent part:  "It is an unlawful employment practice [f]or an employer, because of an individual's . . . age . . . to . . . discharge the individual from employment."

This Court applies the burden-shifting framework set out in

*McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), when

analyzing claims for violation of § 659A.030 brought in federal

court. *Dawson v. Entek Intern.*, 630 F.3d 928, 935 (9th Cir.

2011). Under *McDonnell Douglas*

> [t]he employee must first establish a *prima facie*
> case of discrimination. If he does, the employer
> must articulate a legitimate, nondiscriminatory
> reason for the challenged action. Finally, if the
> employer satisfies this burden, the employee must
> show that the reason is pretextual either directly
> by persuading the court that a discriminatory
> reason more likely motivated the employer or
> indirectly by showing that the employer's
> proffered explanation is unworthy of credence.

411 U.S. at 801-04.

**A. Plaintiff has not established a *prima facie* case of age discrimination.**

To establish a *prima facie* case of age discrimination

under *McDonnell Douglas*, a plaintiff must demonstrate he

(1) belongs to a protected class; (2) was performing [his] job

satisfactorily; (3) was discharged; and (4) either (a) was

replaced by a substantially younger person with equal or inferior

qualifications, or (b) if the plaintiff was discharged as part of

a reduction of the work force, that the discharge occurred under

circumstances giving rise to an inference of age discrimination.

*Siring v. Or. State Bd. of Higher Ed. ex rel. Eastern*, No. 3:11-

CV-1407-ST, 2012 WL 5989195, at *19 (D. Or. Nov. 29, 2012)(Order

adopting Findings and Recommendation)(citing *Nidds v. Schindler

Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996)).

Defendants concede Plaintiff belongs to a protected class, he was performing his job satisfactorily, and he was discharged.  Defendants, however, contend Plaintiff cannot establish a *prima facie* case of age discrimination because Plaintiff was not replaced by a substantially younger person with equal or inferior qualifications.

As noted, the record reflects Plaintiff, who was 68 years old at the time of his termination, was replaced by Clinton, who was 64 years old at the time that he replaced Plaintiff.  Plaintiff concedes Clinton was well-qualified for the position of County Surveyor.  Plaintiff, however, asserts he was terminated as part of a reduction in force, and, therefore, the fact that he was not replaced by a substantially younger individual is not fatal to his claim.[4]

In *Nidds* the Ninth Circuit explained the showing required in a reduction in force situation and noted the inference of age discrimination "can be established by showing the employer had a continuing need for [the employee's] skills and services in that his various duties were still being

---

[4] Defendants contend Plaintiff was not terminated as part of a reduction in force because such a reduction requires the termination or lay off of more than one employee and Plaintiff was the only employee terminated.  Because the Court concludes Plaintiff has not established a *prima facie* case of discrimination, however, the Court declines to address whether termination of a single employee constitutes a reduction in force.

13 - OPINION AND ORDER

performed [and] that others not in [the employee's] protected
class were treated more favorably." 113 F.3d at 917 (quotations
omitted). The record does not reflect any individuals who were
not in Plaintiff's protected class were treated more favorably
than Plaintiff. In fact, Clinton, at the age of 64, was also in
the class protected by § 659A.030(1)(a).[5]

On this record the Court concludes Plaintiff has not
established a *prima facie* case of discrimination based on age.

**B.  Defendants have articulated a legitimate, non-
    discriminatory reason for Plaintiff's termination.**

Even if Plaintiff had established a *prima facie* case of
age discrimination, Defendants have articulated a legitimate,
nondiscriminatory reason for Plaintiff's termination.
Specifically, the Surveyor's Office was experiencing continuing
financial issues and a serious budget shortfall in 2011. The
record amply supports the need for the Surveyor's Office to
decrease staff in order to meet the budget. In addition, the
record reflects Clackamas County's opinion that the ratio of
managers to line staff in the Surveyor's Office was top heavy.
At the March 1, 2011, meeting Plaintiff made clear to Gilmour and
Cartmill that he did not believe a reasonable solution was for
him to work .7 time and to terminate Clinton. Gilmour and

---

[5] Oregon Revised Statute § 659A.030(1) prohibits employers
from discharging an individual who is at least 18 years old
because of the individual's age.

Wheeler, however, recognized Clinton was in a position to "bump" another employee if he was terminated.  Thus, termination of Clinton would not result in the kind of cost savings or readjustment of the management to staff ratio that the Surveyor's Office required.  Plaintiff, however, was not in a position to bump another employee, and, therefore, his termination in combination with elimination of the Deputy Surveyor position legitimately accomplished the cost savings and ratio adjustment required by the County.

**C.    Plaintiff has not established Defendants' articulated legitimate, nondiscriminatory reasons are pretextual.**

Plaintiff asserts Defendants' stated reasons for terminating Plaintiff are mere pretext.  To support his assertion, Plaintiff points to the fact that when the Surveyor's Office began to experience serious financial problems, Gilmour proposed, and other County employees supported, programs that created incentives for older workers to retire voluntarily. Plaintiff does not cite any cases in which courts analyzed voluntary retirement programs and age discrimination under § 659A.030(1)(a).  Courts, however, have analyzed the issue in the context of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*, and concluded voluntary retirement programs are not evidence of age discrimination in violation of the ADEA.  For example, in *Henn v. National Geographic Society* the defendant experienced a decline in advertising and decided to

15 - OPINION AND ORDER

reduce the number of employees selling advertisements.  819 F.2d
824, 826 (7ᵗʰ Cir. 1987).  To that end the defendant offered
every advertising salesperson over the age of 55 the option of
early retirement with a severance package consisting of money,
medical coverage, and some supplemental life insurance.  *Id*.
Twelve salespersons took advantage of the early-retirement
package.  Four of those salespersons subsequently brought an
action against the defendant alleging their separation violated
the ADEA.  The court concluded the defendant's retirement program
did not create any inference of age discrimination:

> Retirement is not itself a *prima facie* case of age
> discrimination, not unless all separations from
> employment are.  And . . . an offer of incentives
> to retire early is a benefit to the recipient, not
> a sign of discrimination.  Taken together, these
> two events - one neutral, one beneficial to the
> older employee - do not support an inference of
> age discrimination.  We agree with *Coburn* and
> *Diamond* that an early retirement package is a
> boon; we therefore must disagree with *Paolillo's*
> conclusion that early retirement presumptively
> establishes age discrimination.

*Id*. at 828 (citing *Coburn v. Pan Am. World Airways, Inc*., 711
F.2d 339 (D.C. Cir. 1983); *Ackerman v. Diamond Shamrock Corp*.,
670 F.2d 66 (6ᵗʰ Cir. 1982); and *Paolillo v. Dresser Indus.,
Inc*., 813 F.2d 583 (2d Cir. 1987)).  *See also Robinson v. PPG
Indus., Inc*., 23 F.3d 1159, 1163 (7ᵗʰ Cir. 1994)("[V]oluntary
retirements do not give rise to an inference of age
discrimination."); *Houghton v. SIPCO, Inc*., 38 F.3d 953, 959 (8ᵗʰ
Cir. 1994)("An offer of early retirement by itself does not

16 - OPINION AND ORDER

violate ADEA; it merely gives an advantage to the older employees
who are eligible to accept it."); *Peterson v. Seagate U.S. LLC*,
809 F. Supp. 2d 996, 1002 (D. Minn. 2011)("[A]n early retirement
program is not presumptively discriminatory."); *Becka v. APCOA/*
*Standard Parking*, 146 F. Supp. 2d 1109, 1115 (C.D. Cal. 2001)
("[O]ffering of retirement packages is not an indication of
age-based discriminatory animus.").

Moreover, it is undisputed that the County Surveyor's
Office experienced serious financial difficulties beginning as
early as 2008.  It is also undisputed that the declining budget
required the Surveyor's Office to decrease its staff every year
beginning in 2009.  The Court concludes proposing and supporting
voluntary retirement programs under those circumstances does not
establish discriminatory intent or motive.  As one court
explained:

> In [a reduction in force (RIF)], "the risk inhered in
> eligible employees' failure to accept [early
> retirement], the risk that their jobs might be
> eliminated because of economic pressure on the company,
> is . . . insufficient to suggest age discrimination
> . . . .  [The] risk would be shared by all remaining
> employees." *Bodnar*, 843 F.2d at 194.  The option of
> early retirement can be beneficial to eligible
> employees because, while the risk in a RIF is shared by
> the entire workforce, the availability of an early
> retirement option affords eligible employees . . . "a
> means to mitigate that risk which was not available to
> other employees." *Id*.  Indeed, courts have called
> early retirement programs "in many situations, the
> fairest alternative available to a company," *id*. at
> 192, and "a humane practice," *Coburn*, 711 F.2d at 344.
> A voluntary buyout program combined with early or
> normal retirement or resignation is not an adverse

employment practice.

*Aliotta v. Bair*, 576 F. Supp. 2d 113, 121 (D.D.C. 2008).

Plaintiff also relies on the fact that Defendants did not eliminate Plaintiff's position, but instead terminated Plaintiff. Plaintiff, however, does not offer any evidence to establish that Defendants' legitimate, nondiscriminatory reason for terminating Plaintiff rather than Clinton (based on the fact that Clinton was in a position to bump another employee) was pretextual. Plaintiff, in fact, concedes Clinton was in a position to bump another employee and Plaintiff was not. Plaintiff also concedes the County desired to reduce the overall number of managerial positions in the Surveyor's Office, and elimination of the Deputy Surveyor position accomplished that goal.

In summary, the Court concludes Plaintiff has not established a *prima facie* claim of age discrimination. Even if Plaintiff had established a *prima facie* claim, Plaintiff has not established Defendants' stated legitimate, nondiscriminatory reasons for terminating Plaintiff were pretextual. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's claim for age discrimination.

**II. Plaintiff's § 1983 claim for violation of his right to free speech under the First Amendment of the United States Constitution.**

Plaintiff brings his Second Claim under § 1983 for violation

18 - OPINION AND ORDER

of his right to free speech under the First Amendment.
Specifically, Plaintiff contends Defendants terminated his
employment in retaliation for Plaintiff's statements at the
March 1, 2011, meeting related to Gilmour's proposal to reduce
Plaintiff to .7 time and to terminate Clinton.

**A.    Section 1983**

Section 1983 provides in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of
> any State or Territory or the District of
> Columbia, subjects, or causes to be
> subjected, any citizen of the United States
> or other person within the jurisdiction
> thereof to the deprivation of any rights,
> privileges, or immunities secured by the
> Constitution and laws, shall be liable to the
> party injured in an action at law, suit in
> equity, or other proper proceeding for
> redress.

"In order to survive a motion for summary judgment on a
§ 1983 claim, the plaintiff must establish a genuine issue of
material fact that the defendant (1) acted under the color of
state law, and (2) deprived him of a constitutional right."
*Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009)
(citing *Levine v. City of Alameda*, 525 F.3d 903, 905 (9th Cir.
2008).

**B.    The First Amendment**

"The First Amendment shields public employees from
employment retaliation for their protected speech activities."
*Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir.

19 - OPINION AND ORDER

2012)(citing *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).

> Out of recognition for the State's interest
> as an employer in regulating the speech of
> its employees, however, [the court] must
> arrive at a balance between the interests of
> the [public employee], as a citizen, in
> commenting upon matters of public concern and
> the interest of the State, as an employer, in
> promoting the efficiency of the public
> services it performs through its employees.

*Id.* (quotations omitted).  To "strike this balance when

evaluating a First Amendment retaliation claim," courts must ask

"'a sequential five-step series of questions.'" *Id.* (quoting *Eng*

*v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)).

> First, [the court] consider[s] whether the
> plaintiff has engaged in protected speech
> activities, which requires the plaintiff to
> show that the plaintiff:  (1) spoke on a
> matter of public concern; and (2) spoke as a
> private citizen and not within the scope of
> her official duties as a public employee.  If
> the plaintiff makes these two showings, [the
> court] ask[s] whether the plaintiff has
> further shown that she (3) suffered an
> adverse employment action, for which the
> plaintiff's protected speech was a
> substantial or motivating factor.  If the
> plaintiff meets her burden on these first
> three steps, thereby stating a *prima facie*
> claim of First Amendment retaliation, then
> the burden shifts to the government to escape
> liability by establishing either that:
> (4) the state's legitimate administrative
> interests outweigh the employee's First
> Amendment rights; *or* (5) the state would have
> taken the adverse employment action even
> absent the protected speech.

*Id.* (citations omitted).

**C.    Public Concern**

Whether an employee's speech addresses a matter of public concern is a question of law for the Court that must be determined "'by the content, form, and context of a given statement, as revealed by the whole record.'" *Karl*, 678 F.3d at 1069 (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 & n.7 (1983)).  Of those three factors, the content of the employee's speech "is generally the most important" factor.  *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103 (9th Cir. 2011).

"[S]peech that concerns 'issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government merits the highest degree of first amendment protection." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).  "'Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community.'" *Karl*, 678 F.3d at 1069 (quoting *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995)).  "[S]peech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." *Id*. (quotation omitted).

Defendants assert Plaintiff's March 1, 2011, speech in

which he objected to the plan to reduce him to .7 time and to the termination of Clinton related solely to a personnel issue and, therefore, was not a matter of public concern.  Plaintiff, however, asserts his speech on March 1, 2011, was related to the possibility that citizens would not be able to obtain necessary services from the Surveyor's Office when they needed services if Plaintiff was working .7 time, there was not any Deputy Surveyor, and Plaintiff did not appoint another employee to act in his absence.  Plaintiff, therefore, contends he spoke on a matter of public concern.

The Court concludes Plaintiff's speech on March 1, 2011, is best categorized as mixed speech that involves both public and private concerns.  The parties do not cite, nor could this Court find, a Ninth Circuit case setting out the proper analysis when speech contains matters of both public and private concern, but other circuits have addressed the issue.  In *Akridge v. Wilkinson* the Sixth Circuit addressed "mixed speech cases[, when] the employee at issue speaks not only as both a citizen and an employee, but the content of her speech involves both matters of public and private concern."  178 F. App'x 474, 478 (6th Cir. 2006).  The Sixth Circuit concluded

> if any part of an employee's speech, which
> contributes to the [adverse employment action],
> relates to matters of public concern, the analysis
> must proceed to the next step: the balancing
> analysis required by the Supreme Court's decision
> in *Pickering v. Board of Education*, 391 U.S. 563,

22 - OPINION AND ORDER

> 88 S. Ct. 1731, 20 L. Ed.2d 811 (1968).

*Id.* at 479 (quotations omitted).  Under *Pickering*

> public employee speech, even if touching on
> matters of public concern, will not be
> constitutionally protected unless the employee's
> interest in speaking on these issues outweighs the
> interest of the State, as an employer, in
> promoting the efficiency of the public services it
> performs through its employees.

*Id.* (quotation omitted).

The Fifth Circuit employed a balancing test similar to that of the Sixth Circuit in *Teague v. City of Flower Mound, Texas*, 179 F.3d 377 (5th Cir. 1999).  In *Teague* the plaintiffs, former Flower Mound Criminal Investigation Division (CID) police officers, became aware of possible wrongdoing by a fellow officer, Wess Jones.  Plaintiff Tom Teague placed Jones on administrative leave and conducted an internal affairs investigation.  Plaintiff David Burkett began a parallel criminal investigation into Jones's conduct.  Ultimately Police Chief Dave Brungardt stopped the plaintiffs' investigations and hired an outside private investigating (PI) firm to look into Jones's possible wrongdoing.  The PI firm cleared Jones of all wrongdoing.  The plaintiffs and other officers believed there was "probable cause to believe" that Jones "had violated several sections of the Texas Penal Code, and internal Flower Mound personnel rules" and requested a meeting with Chief Brungardt.  Chief Brungardt refused the meeting and advised the plaintiffs

23 - OPINION AND ORDER

that the district attorney's office had also investigated Jones's
conduct and cleared him.  The plaintiffs then spoke to an
assistant district attorney who advised them that the district
attorney's office had not investigated Jones.  This led the
plaintiffs to believe Chief Brungardt "was covering up for
Jones." *Id*. at 379.  Pursuant to "City Rules," the plaintiffs
filed a grievance against Chief Brungardt.  The plaintiffs also
requested Brungardt to permit them to meet with Town Manager Ron
Ragland regarding these issues.  Although Brungardt initially
granted permission, he withdrew it three days later.  In the
meantime Brungardt transferred the plaintiffs out of CID at their
request.  Officer Burkett's replacement, Ron Nottingham, informed
Brungardt that the CID had an enormous backlog of cases in the
wake of the plaintiffs' "supervisory tenure," which prompted
Brungardt to launch an investigation into the plaintiffs, to give
the plaintiffs administrative warnings, and to place the
plaintiffs on administrative leave. *Id*.  The PI firm ultimately
concluded the plaintiffs had been derelict in their duties, and
Chief Brungardt subsequently fired the plaintiffs.  The
plaintiffs appealed their terminations to Ragland, but he
sustained their termination.

The plaintiffs brought an action under § 1983 in which
they alleged, among other things, that they were terminated in
violation of their First Amendment right to free speech.  The

district court granted the defendants' motion for summary

judgment, and the plaintiffs appealed.  The Fifth Circuit

affirmed the district court on appeal.  The Fifth Circuit found

the plaintiffs' grievances involved mixed public speech (concerns

about police misconduct) and private speech (the desire to

"clear[] their names").  *Id*. at 383.  Nevertheless, the court

concluded the plaintiffs

>            do not enjoy the First Amendment protections of
>            citizens speaking to a matter of public concern.
>            Although interspersed with apparently genuine
>            concerns regarding police wrongdoing, Teague's and
>            Burkett's grievances were primarily motivated by,
>            and primarily addressed, concerns particular to
>            their private interests.

*Id*. at 383-84.  The court acknowledged "the speech in question

was predominantly public [because s]peech concerning police

misconduct is public in content."  *Id*.  The context of the

speech, however, "is more appropriately characterized as private:

It was made in the setting of a private employee-employer

dispute."  *Id*.  In addition, the "speech in question is

undeniably private in form."  *Id*.

Similarly, the Seventh Circuit has held

>            [w]hen the speaker's motives are mixed, as often
>            they are, the speech will not be found to raise a
>            matter of public concern if the overriding reason
>            for the speech, as determined by its content, form
>            and context, appears to have been related to the
>            speaker's personal interests as an employee.

*Hartman v. Bd. of Trustees*, 4 F.3d 465, 471-72 (7th Cir. 1993).

Although this is a close case, the Court concludes

Plaintiff has not established that his interest in speaking on
the issues associated with Gilmour's plan to reduce him to .7
time outweighs the interest of Clackamas as an employer in
attempting to balance its budget and to lessen the ratio of
management employees to line employees.   The County has a strong
interest in maintaining its ability to serve the public through a
Surveyor who will ensure there is an individual authorized and
available to sign plats when the Surveyor is not in the office.
Plaintiff noted when the County Surveyor was not in the office,
he could "appoint somebody to act in [his] absence."  Plaintiff,
however, suggested he was not likely to do so if he continued in
his position as County Surveyor and the Deputy Surveyor position
was eliminated when he stated:  "[I]f I wasn't there on a
particular day, and somebody wanted to have a plat recorded,
. . . it wasn't necessarily [within] anybody else's ability to
sign that plat out. . . unless [he] so authorized it."  In
addition, the context of Plaintiff's speech was private:  It
occurred during a private meeting to discuss the merger of the
Surveyor's Office with the Engineering Office and to discuss the
budget issues.

        Accordingly, the Court concludes on balance that the
"overriding reason for" Plaintiff's speech at the March 1, 2011,
meeting was related to Plaintiff's "personal interests as an
employee" rather than a matter of public concern.

26 - OPINION AND ORDER

B.    **Speaker's Status**

The Court also considers whether Plaintiff's statement
at the March 1, 2011, meeting was made in his capacity as a
private citizen or pursuant to his official job duties, which is
a mixed question of law and fact.  *Karl*, 678 F.3d at 1071 (citing
*Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129
(9th Cir. 2008)).

A public employee's speech is not protected by the
First Amendment when it is made pursuant to the employee's
official job responsibilities.  *Karl*, 678 F.3d at 1071 (citing
*Garcetti*, 547 U.S. at 426).   "[W]ork product" that "owes its
existence to a public employee's professional responsibilities is
not protected by the First Amendment because an employer may
exercise . . . control over what the employer itself has
commissioned or created."  *Karl*, 678 F.3d at 1071 (quotations
omitted).   Thus, "if the public employee was paid for the speech
— *e.g.*, drafting a memorandum, creating a report, advising a
supervisor — then that compensation might be indicative" that the
speech was made pursuant to official duties and, therefore,
unprotected by the First Amendment.  *Huppert v. City of
Pittsburg*, 574 F.3d 696, 704 (9th Cir. 2009).   "Conversely, a
public employee's speech on a matter of public concern is
protected if the speaker had no official duty to make the
questioned statements, . . . or if the speech was not the product

of perform[ing] the tasks [the employee] was paid to perform.

*Karl*, 678 F.3d at 1071 (quotations omitted).

> "Facts that can be found by application of . . .
> ordinary principles of logic and common experience
> . . . are ordinarily entrusted to the finder of
> fact." *Bose Corp. v. Consumers Union of United
> States, Inc.*, 466 U.S. 485, 501 n.17, 104 S. Ct.
> 1949, 80 L. Ed.2d 502 (1984).  As the present case
> demonstrates, the scope and content of a
> plaintiff's job responsibilities can and should be
> found by a trier of fact through application of
> these principles.  The *Garcetti* Court itself seems
> to have anticipated as much when it explained that
> "[t]he proper inquiry is a practical one,"
> requiring more than mere mechanical reference to
> "[f]ormal job descriptions [, which] often bear
> little resemblance to the duties an employee
> actually is expected to perform." *Garcetti*, 547
> U.S. at 424-25, 126 S. Ct. 1951.

*Posey*, 546 F.3d at 1129.

Plaintiff asserts he was not speaking pursuant to any
official job duty when he objected to Gilmour's proposal at the
March 1, 2011, meeting.  Although Plaintiff's "speech dealt
exclusively with his personnel dispute," Defendants do not
address Plaintiff's speech in terms of his specific job duties.

As noted, the scope and content of a plaintiff's job
duties is a question of fact.  Because the scope and content of
Plaintiff's job duties are not set out in this record, the Court
concludes a question of fact exists as to whether Plaintiff was
speaking pursuant to his job duties at the March 1, 2011,
meeting.  This dispute of fact, however, does not preclude
summary judgment as to Plaintiff's First Amendment claim because

28 - OPINION AND ORDER

the Court has concluded Plaintiff was speaking on a matter of private concern. *See, e.g.*, *Posey*, 546 F.3d at 1129 ("Determining that there are genuine disputes of material fact as to [the plaintiff's] employment duties does not necessarily mean, however, that the grant of summary judgment was improper.  If [the plaintiff's] letter and subsequent meeting were to fail either of the other two elements of the protected status inquiry, then summary judgment would have been appropriate on these alternate grounds.").

### C.    Substantial or Motivating Factor

Plaintiff asserts his speech at the March 1, 2011, meeting was a motivating factor in his termination.  Plaintiff testified at deposition that Gilmour became angry at the March 1, 2011, meeting when Plaintiff objected to Gilmour's proposal. Cartmill testified at deposition that the meeting was "heated." Gilmour testified at deposition that he was not angry; that the discussion was intense; that he and Cartmill later discussed Plaintiff's reaction at the March 1, 2011, meeting; and that he found Plaintiff's reaction, particularly Plaintiff's statement that he did not have to appoint anyone to act as a deputy when Plaintiff was not in the office, to be "of concern."  Plaintiff points to Gilmour's deposition testimony that he may have told Wheeler and/or Cartmill that he felt Plaintiff was insubordinate at the meeting.

29 - OPINION AND ORDER

The record reflects the County Surveyor's Office was struggling financially and Gilmour and Wheeler had been attempting to reach a solution for months that would address both the gap in funds and the fact that the Surveyor's Office was "top heavy"; *i.e.*, the Surveyor's Office had a high ratio of management to staff. The record also reflects Plaintiff objected to Gilmour's proposal to reduce Plaintiff to .7 time and instead suggested the County terminate Clinton. Plaintiff points out that terminating his employment and moving Clinton to the position of County Surveyor did not ultimately save the County as much money as Plaintiff believes the County needed to save. Plaintiff, however, does not deny the decision saved the County funds over all and permanently removed a management position from the Surveyor's Office.

Although this again is a close question, the Court concludes Defendants have not conclusively refuted that a genuine dispute of material fact exists as to whether Plaintiff's speech at the March 1, 2011, meeting was a motivating factor in his termination. Nevertheless, as noted, that does not preclude summary judgment as to Plaintiff's First Amendment claim because the Court has concluded Plaintiff was speaking on a matter of private concern.

**D.  Termination Absent the Protected Speech**

If a plaintiff meets his burden on the first three

steps set out in *Karl* and thereby states a *prima facie* claim of
First Amendment retaliation, then the burden shifts to the
government to escape liability by establishing that the state
would have taken the adverse employment action even absent the
protected speech.

> The government's burden at [the final] step is to
> show that:  (1) "the 'adverse employment action
> was based on protected and unprotected
> activities;'" and (2) "the state 'would have taken
> the adverse action if the proper reason alone had
> existed.'"  *Eng*, 552 F.3d at 1072 (quoting
> *Knickerbocker v. City of Stockton*, 81 F.3d 907,
> 911 (9th Cir. 1996))(emphasis added in *Eng*).

*Karl*, 678 F.3d at 1072.

As noted, at the time of Plaintiff's termination, the
County Surveyor's Office had been experiencing financial
difficulties since at least 2008 and continually reducing and
consolidating staff, had merged the Surveyor's Office with the
Engineering Office, and had a high ratio of management to staff
that Wheeler and Gilmour believed to be unacceptable.  The record
reflects Wheeler and Gilmour had attempted to reach a solution
that would address both the gap in funds and the fact that the
Surveyor's Office was "top heavy"; *i.e.*, it had a high ratio of
management to staff for months.  The record also reflects Clinton
had the ability to bump another employee if he was terminated,
but Plaintiff did not.  In addition, Plaintiff testified at
deposition that the County Surveyor could, if he "so chose, . . .
appoint somebody to act in [his] absence."  Elimination of the

31 - OPINION AND ORDER

Deputy Surveyor position, therefore, would not necessarily create the situation that Plaintiff delineated at the March 1, 2011, meeting (*i.e.*, that the Surveyor would not be in the office and no one could perform his duties until he returned, which could potentially lead to possible legal action by persons requiring the services of the County Surveyor).  Thus, elimination of the Deputy Surveyor's position would not, in fact, create efficiency or timeliness issues.

In summary, terminating Clinton would not have achieved the cost savings that Wheeler advised Gilmour the County Surveyor's Office needed to achieve because of Clinton's ability to bump another employee, elimination of the Deputy Surveyor position would not create the risk of lawsuits that Plaintiff projected, and the failure to eliminate the Deputy Surveyor position would leave the Surveyor's Office with an unacceptably high ratio of management to staff.  In the end, Plaintiff does not deny the decision to terminate him and to promote Clinton saved the County funds or that it permanently removed a management position from the Surveyor's Office and thereby improved the management to staff ratio.

On this record the Court concludes Defendants have established they would have terminated Plaintiff in the absence of his March 1, 2011, speech.  Thus, even if Plaintiff's record on this Motion establishes a *prima facie* case of discrimination,

that factor does not warrant judgment in Plaintiff's favor on Plaintiff's First Amendment claim.   Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's First Amendment claim.


## **CONCLUSION**

For these reasons, the Court **GRANTS** Defendants' Motion (#44) for Summary Judgment and **DISMISSES** this matter **with prejudice**.

IT IS SO ORDERED.

DATED this 12th day of August, 2013.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

33 - OPINION AND ORDER